Judge Underwood,
dissenting from the views of the majority of the Court, in this case, delivered the following Opinion :
The opinion just delivered, maintains it to be law, that an agent, or bailee, who receives a slave, and parts with the possession, according to the terms of the trust, without any knowledge that there is any paramount title to *122 that of his bailor, is responsible to the trae owner, for the value of the slave and his hire from the time process was served. , ,
* am °PPoset' t° the doctrines of the opinion, because I believe they misapply, or overturn, principles which have been long recognised, and introduce a new rule, which, so far as I can foresee, will bring about a state of distrust and suspicion, tending to destroy the courtesies of life, and to clog the business transactions of society.
A man receives a jewel from his friend, and promises to deliver it to his' friend’s wife or daughter ; or he meets with a person driving cattle, horses, or hogs to market, who is sick and cannot proceed, and he engages to take charge of the drove, proceed with them, make sales, and return the money to the drover ; or he engages to transport produce by land or water, and to sell it, or to deliver it to a designated person ; and he performs the trust in good faith, without knowledge that any one has title to the property delivered to him, paramount to him from whom he received it ; he will, nevertheless, under the opinion delivered, be compelled to pay the true owner the value of all the property which has thus innocently passed through his hands.
The doctrine of the opinion amounts to this : that an agent, or bailee, who receives goods into his possession from his principal, thereby incurs the same liabilities to the true owner, which his bailor was under ; and that this liability continues, although the agent, or bailee, may have parted with the possession according to his contract, without knowledge of the adverse claim. The bailee is thus made surety for the bailor, and must answer for all his wrongs. If benevolence incline him to receive and sell an article from the heacj of a sick family, and to purchase necessaries for their use, his kindness is taxed with the full value of the article in favor of the true owner. His ignorance and the purity of his motives are no shield.
In my researches, I have found no law which, in my opinion, sanctions a doctrine so incompatible with, what seems to me to he, the dictates of natural justice and. sound morals. On the contrary, the lay, as laid down *123 in several elementary books and adjudged cases, is fully up to the point against it.
In Bacon’s Ab. Title, Bailment, D. it is said : “ If I deliver goods to B, and C, that hath right, demands them of him, if B, either before or pending the action,- deliver over the goods to me, this is a good bar to the action of C, brought against B ; for since B hath undertaken to deliver the goods back to me, heshallnotbe charge-' able for the honest performance of that undertaking; for B, that is trusted with my possession, shall not remove or alter iny possession, and, therefore,, shall not be put to-answer for that to which the law obliges him.'” In support of the text F. N. B. 138, Roll’s Ab. 607, and 2 Bos. and Pul. 462, are cited., Here it is expressly laid down, that the bailee may discharge himself from the-action of the right owner, by restoring the goods to his bailor pending, the action. Were 1 to concede that this was going too far, yet where the restoration takes place before the action of the right owner is commenced, and before notice to the bailee of the paramount title, I cannot perceive the slightest grounds for holding him liable. The reason against liability in such case, is, the law “obliges the bai-lee to restore the possession, because it is his contract to do so. It would, thérefore, be iniquitous in the law to give damages against a man for doing that which is enjoined as a legal duty. The bailee cannot set up an outstanding title to justify withholding" the possession from the bailor. If he could, he would thereby change the-bailor’s possession, and put an end to all faith in contracts of bailment. The bailee is estopped to deny the title of his bailor. ’ The case of Stephens vs. Vaughan, 4 J. J. Marshall, 207, fully supports this view of the subject. It is there said, “ the bailee cannot deny the right of his bailor, unless he can shew that it had been ascertained judicially, that some other person had a right to demand restitution ; or unless he could prove that some other person, having a better right than his.bailor had to the property, had taken it from him without his fault.” That case maintains the position, that nothing can exonerate the bailee from the action of the bailor, but the j udgment of a court, recaption by the right owner, “ in a pro *124 per manner,” which “ is virtually the act of the law,55 (to use the language of the case,) or the act of God.
If the bailee agree to deliver the property put into his hands to another, or agree to sell it for the use of the foai-lor, and pay over the money, why shall he not be held £t to the honest performance of his undertaking” in-such cases, just as he is when he receives the property to-keep safely ? I cannot perceive a shadow of difference between the cases in principle. If he does perform in good faith, the reason to exempt him from liability to the true owner, is just as strong as it is in the case where he receives the property to keep for an hour, and then restores it to the bailor, without knowledge of any adverse claim. Jones on Bailment, (recent edition) page 51, contains a reference to the code of Napoleon, for the purpose of shewing that the bailee who recieves property to sell for his bailor, and does it, is entitled to the same protection as though he received it for safe keeping only, and restored it in good faith to the bailor. That code is not authoritative here. But it shews that enlightened Fvanee has adopted the principle, which I think sanctioned by English jurisprudence, and eminently conducive to the convenience and prosperity of every civilized nation. It is highly important, in my judgment, to encourage contracts between bailors and bailees, principals and agents ; or rather not to discourage them, by imposing onerous burdens on bailees and agents, when they perform their trusts in good faith, without knowing of, or intending to interfere with, the rights of third persons.
In considering the facts of this case, my brethren have arrived at the conclusion, that the conduct of Pool should be regarded in the same light, as if he had admitted, that he had not paid over to Carlton, the money which he received for the sale of the slaves in Missouri, because “ there is no evidence that he ever made such payment.” I cannot consent tó the propriety of the conclusion ; nor do I perceive, if it were correct, how it could essentially change the character of Pool’s defence. There is no evidence that he ever received any money. Whether he sold for cash in hand, or on credit, is not stated.. If it can be inferred that he so.ld for cash in hand, then the legal infer- *125 dice from the facts should be, that he had paid over the money to his principal, because it was his duty to do so. The presumption of law is, that he performed that duty, until the contrary is made to appear by evidence. The onus devolved on the defendants in error. They proved Pool’s confessions, and from them it appears that he was employed as an agent, by Edward Carlton, who had brought the slaves from Virginia, claiming and exercising acts of ownership over them, to carry the slaves to Missouri, and sell them ; and that he received the slaves from Carlton, “carried them to Missouri, and had there disposed of them, as agent for said Edward Carlton, and had no longer the possession of said two negroes, and did not then know that the plaintiffs had any claim to the said negroes.”
Suppose Pool had failed to pay over the money to Carlton, and that the latter had sued him for it, could he resist a recovery upon the ground that Adldsson and Toote were the right owners of the slaves ? He certainly could not, unless he should be allowed, contrary to the authorities cited, to set up a title in strangers, agaiust his bailor. But concede that he might set up such title, still, if he was as ignorant of it upon the trial, as he was when lie sold the slaves, he could not make such a de-fence against Carlton, and the consequence would be, that Carlton would recover a judgment for the money. How then would matters stand ? Carlton would compel Pool to pay his judgment, which would be no defence against Adkisson and Toote; and they, under the doctrines of the opinion delivered, would thereafter recover of Pool, the value of the slaves and hire for their detention •' Thus Pool is made to pay twice. After he pays Adkis-son and Toote, can he recover the amount oí their judgment from Carlton, in the face of the judgment in Carlton’s favor ? ' Or what remedy shall Pool have for the injustice and ruin which he innocently suffers ? I confess I cannot answer these questions satisfactorily. Pool ought to be redressed; but I leave the form and nature of his action to those who shall place him in the difficulty. I fear, however, that he can have no redress„under the doctrines of the opinion ; for that says, by the “ as- *126 portation and sale of the slaves he did an injury to the plaintiffs, for which they had a right to hold him responsible, in trespass, trover or detinue.” Now, if Pool be a trespasser, he is certainly a joint trespasser with Carlton, and it would be directly in violation of the principle, that one trespasser shall not have contribution from another, to, let Pool recover from Carlton,where they have jointly trespassed on the property of Adkisson and Toote. It should be kept in mind, that the motives of Pool, and his ignorance of the rights of Adkisson and Toote, are not allowed by the opinion to operate in his favor against them. How are they to benefit him when he comes to litigate the matter with Carlton ? But take it that Pool is a separate, and not a joint tortfeasor, can he call upon Carlton to pay him for his own tortious conduct, and thereby take advantage of his own wrong ?
To constitute an injury for which the law gives a remedy to the party aggrieved, there must be, either a violation of a contract, or a tort perpetrated. There is no pretence for contending that Pool has vióláted any contract. There is as little, in my opinion, for saying that he has been guilty of a tort. Carlton had possession of the slaves. The deed of trust which he had executed in Virginia, to the defendants in error, was unknown. Carlton’s possession -was prima facie evidence of a good title. In the absence of all knowledge of the deed of trust, actual or constructive, the law authorized Pool and all others to regard Carlton as the true owner. Was it a tort to receive the possession from him who was the equitable owner, and who, prima facie, held the absolute title ?. I thihk it could not be a tort, for if it was, then the restoration of the possession to Carlton, could not discharge Pool from the action of the right owners, as is clearly proved by the authorities to be the law. The taking possession, from him who was possessed in fact, was, therefore, a lawful act on the part of Pool. If a man finds a runaway slave, or inanimate property, ,it is well settled that he may take the property, and keep it for the true owner. If he can take property which he knows does not belong to him, when he finds it in the actual posses-, sion of no one, but yet in the constructive possession of *127 the right owner ; how is it unlawful for him to take possession of property, which the true owner has lost, from the individual who has it in actual possession ? The only difference in the cases is this, where he finds property not actually possessed by any one, and takes it, he holds as the trustee of the right owner ; but where he receives the property from one actually possessed under a contract of bailment, then he holds for his bailor, and the law binds him to be faithful to his bailor and his title. In either case, the act of taking is lawful, and not tortious.
In torts the quo animo may give character to the transaction, and is an important consideration. If I enter upon the land of A, having lawful business to transact with him, it is no trespass. If I make the same kind of entry without lawful business, it may be a tort. Testing the conduct of Pool by the quo animo, he is guiltless. The law invited him to regard Carlton’s possession as evidence of right. He acted upon the inferences which the law justified him in making, from the facts. I cannot consent that .the law shall set snares, and make victims of those who trust in its presumptions.
The possession of the bailee is not an independent, adverse possession It is the possession of the bailor. In regard to real estate, it has been over and over again settled, that the possession of the tenant is the possession of his landlord. There is as much reason for applying this doctrine to chattels, between bailor and bailee, as to lands. If a thief requests me to hold the bridle upon a stolen horse, until he warms his fingers, or takes a drink, will I thereby become possessed of the brute, and incur a liability to the true owner for its value ? If, as auctioneer, I should ride the horse up and down the street, cry him for sale, knock him off to the highest bidder, receive the cash and pay it over to the thief, deducting a commission, do I thereby make myself responsible to the true owner, of whose rights I am altogether ignorant ?
In these, and all similar cases, I look upon, the possession of the bailee, agent, or servant, as the possession of the bailor, principal, or master. Their title is identical, except that the bailee &c. hold in subordination to him from whom the possession is received. The possession *128 in fact may be changed, but the possession in law remains the same, and continues with the bailor &c.
If the tenant of the freehold pays rent to his landlord during his occupancy, and then leaves the premises, restoring the possession to the landlord, who is thereafter evicted, I deny that the successful claimant can have his action against the tenant for the mesne profits. The reason is, that the tenant paid his rents in discharge of a contract which legally bound him, and having done so, cannot be again charged for the same thing. The same rule should apply to the bailee who honestly performs his contract in respect to a chattel.
If Pool did not act tortiously in lalcing the slaves, he is not liable, unless he thereafter acted tortiously, in converting or disposing of them. I will now endeavor to shew, that he has not acted tortiously after the slaves were put into his hands. If the taking, or reception, was lawful, when did the tort thereafter commence? Was it when he carried the slaves across the state line into Missouri ? If he had carried them to Virginia and delivered them to the defendants in error, would such removal from. Kentucky have been tortious ? I can perceive nothing more1 in the removal of the slaves out of the state, than there is in removing them from one farm to another in the same county. But perhaps it is the sale made by Pool, that constitutes the tort. If he had not sold them he would have violated his contract with Carlton, and could not avoid paying damages to him for the breach, unless he could resist by shewing the paramount title of the defendants in error,which, as we have alreadyseen, he could not do. If the sale makes the tort, and renders him liable to Adkisson and Toote, the dilemma may result in his ruin, and there is no escape. I hold that the sale is not tortious on the part of Pool. It was not his act, but the act of his employer Carlton. As the agent merely, Pool was bound to transact the business in the name of his principal. If he did so, the purchaser could look to Carlton only, and Pool would incur no personal liability to him. Upon what principle is it, that he incurs a personal liability to the right owner, whose title is unknown ? if there be any principle which creates such *129 liability, it must be found in the conversion of the property to the use of Carlton, or to his own use. I will endeavor to shew that Pool has clone neither of these thirígs.
First. He did not convert the property to Carlton’s use, for Carlton had done that himself, by illegally removing the slaves from Virginia, and by the very act of employing Pool to take them off and sell them for him. Unless, therefore, a man by employing a dozen agents, ¡after he has fully converted property to his use, may haveit twelve times re-converted to his use, by the action of these different agents, Pool has been guilty of no wrong in converting the slaves to Carlton’s use. A conversion once complete, cannot be made more wrong, or be changed into new and distinct causes of action for every use of the property inconsistent with the right of'the true owner. -If I convert the ox of my neighbor to my rise, and thereafter, I employ a driver to work him for me, or a butcher to slaughter him, these agents commit no new offence. I had fully converted the property to my use before they had any thing to do with it, and nothing which they can do will add to the tort which I have already fully consummated. It might as well be said, that every time a man rides a horse which he has illegally converted to his use, that he thereby commits a a new and distinct offence, for which a separate action of trover might be maintained against him, as to contend that if he lends the horse to A, hires him to B, and employs C, D and E to work him, that they are all new tortfeasors, and liable to the right owner for the value of the horse. I regard the persons who thus use the property under authority from the individual who has converted it, as in no w'ay partakers of the original wrong, unless they know that, their bailor is trespassing on the rights of another. It is certain, that in point of morality, they are not guilty. Why then make them guilty under the law ?
Secondly. Pool has not converted the property to his own use. There Is no evidence that he made any profit by the use of it; or that he attempted to do so; or that he claimed the slaves as his own; or that he assumed upon himself any right to control the slaves, except as *130 the agent of Carlton» When a man thus disclaims all right in himself, and is, in good faith, acting for another, from whom he received the possession, there is no pre-tence for alleging that he converts the property to his own use. A son under age cannot excuse himself from a tort, upon the ground that he acted in obedience to the commands of his father. If the father toriiously takes a horse, and leads the horse to his house, and directs his infant son to feed and work t.he horse, and he obeys, does he thereby become a tortfeasor, and liable to the true owner in trespass or trover ? I think not.
The opinion delivered, looking upon Carlton as having no right to the slaves, says, u he who has no legal right to do a thing, cannot delegate authority to another to do it. The power of an agent, being altogether derivative, cannot exceed that of his principal,” &c. &c. These obvious truths, in my opinion, have no application to the present case. I am nót contending that Carlton could give powers which he could not himself exercise. I know that Pool cannot set up a license from Carlton to justify him in doing wrong. -The error of the opinion consists, I think, in confounding or uniting Carlton and Pool, and making the latter guilty because the former is. My effort has been to take a distinction between them, If there be none, I admit that Pool is guilty. Carlton did not pretend to delegate power to Pool, authorizing him to sell the negroes of Adkisson and Toote, or to carry their slaves out of the state. If the letter of attorney had shewn sucli objects upon its face, Pool, knowing the law, must have known, that it could not authorize him to do such acts. Carlton’s power of attorney purported (we must presume it was formally executed,) to authorize Pool to sell Carlton’s slaves. Now, if Carlton delivered slaves belonging to the defendants in error, to be sold as his, under such a power, I admit that the power would not enable Pool to pass the title of Adkisson and Toote. Why ? Because Carlton could not do it himself, and hence, could not create an agent whose powers exceeded his own. But it does not follow from the law, which restricts the agent to the same powers his principal possesses, that if the *131 principal commits a trespass, or tort, in taking property from the true owner, that the agent is equally guilty, if he innocently receive the property as bailee from the principal. I cannot apply the old adage, that the receiver is as bail as the thief, unless the receiver knows of the theft. It is making the bailee who neither aids nor abets, nor attempts to conceal, answerable as accessary, or as co-principal, for wrongs which never entered into his contemplation.
The best definition of bailment which I have found, is in Jacobs’ Law Dictionary. Leaving out the addition, to it of Sir William Jones, it is, “ a delivery of goods in trust, upon a contract, expressed or implied, that the trust shall be faithfully executed on the part of the bailee.” — I find nothing said about the bailee being a tortfeasor, if the bailor is. On the contrary, the very definition shews, that the bailee is bound to perform his trust. If the contract is entered into by the bailee in good faith, the law which authorizes him to enter into the contract, protects him in the faithful execution of it. Pool’s justification is, there, fore, derived from the law, and does not at all depend on any authority derived from Carlton. If a court- of chancery appoints a trustee (a mere bailee,) and directs him to'seil property, supposed to belong to the litigants, but which does not, and they deliver it to him, and he sells it, is he responsible to the true owner as a trespasser, or for the conversion ? Why shall the chancellor’s agent be more favored than the agent of a private individual? The law equally authorized them to assume the trust confided to them, and each acted voluntarily in undertaking to perform.
I am willing to admit, as a general proposition, that where the conduct or acts of a man produce a loss or destruction of property, he is liable to answer in damages to the party aggrieved. But there are many cases,where the person, who, directly and immediately, by his acts, inflicts the deepest wounds which life, liberty and property can sustain, is not responsible to the sufferer. The ministerial acts of the officers of the law are of this description. The sheriff who imprisons the body, or strips a man of all his property, is not responsible, if it should *132 tum out to be a malicious prosecution. The judge may erroneously deprive a man of his liberty or his proper» ty, and yet there may be no redress, but if executive, or judicial officers act corruptly, and knowingly abuse p0werg} to the injury of any one, then the law will charge them with- the consequences, and afford a remedy against them. I may employ a man to transact my busi* ness, and leave him to his own judgment in performing it. His conduct may involve me in losses, even to bank» rupfcy, and still I may not be entitled to redress.' If he acted in good faith, I must bear the loss. The law does not sanction the idea, without exception, that every loss brought upon us by the conduct of others, is an injury. The law says, there is such a tiling as damnum absque injuria,. It is not sufficient to convict Pool of a tort, to shew only that Adkisson and Toote sustained a loss from his conduct.
Í concede that, if Pool had made an absolute purchase of the slaves, and had sold them on his own account, he would have been answerable to the true owners. The reasons for liability in such a case, are very obvious. Every man who purchases property and takes possession, thereby converts it to his own use. His possession is, thenceforth, adverse to all the world. If the purchase be of a chattel, there is a warranty of title, resulting from the mere act of selling, and the purchaser takes the thing, subject to the claims of others who may have bet. ter right, relying on the warranty for indemnity against paramount titles. The case is very different here. Pool made no purchase, did not convert the property, did not hold adversely, and did not accept the slaves under any warranty.
Starkie, Vol. 3. 1494, says, that, “in general, evidence of some tortious act is essential to a conversion.” In page 1497, he says, “ this proof (to-wit, a demand and refusal) is always necessary where the goods came lawfully into the defendant’s possession, as by finding, or upon bailment, or delivery of the owner; but it is unnecessary where a tortious taking of the goods can be proved.” The inference to be drawn from the text, is very strong, that every reception of goods in good faith by a *133 bailee, from the possessor, is la.wful. To make it tortious .a demand and refusal must be proved. Every refusal will not convert the lawful possession into a tort. Starkie, 1499. When the bailee has restored the possession, or performed his trust by parting with the property, he cannot comply with the demand ; and hence no presumption can arise from his refusal, that he has converted the property. It may be proved, that he has not, as in this case, by shewing the manner in which the trust has been discharged. If the bailee-lias been guilty of no tort up to the time of the demand, it seems to me to be impossible to make him a tortfeasor for failing to comply with the demand, when his inability results from, the punctual and faithful performance of his contract before notice of any adverse claim. If there be a conversion, it can only be in those cases where the bailee used the property while he possessed it, and made profit out of it. In these cases, after he has restored the property, the conversion, at most, can only be •partial, and the bailee should, in no event, be required to account to the true owner for more than the value of the service of the slaves, or the horse, for the hour, or the day. I do not admit .he would be accountable for that, because he intended no wrong ; because the law authorized him to presume the bailor had title; because he came lawfully into possession, under a contract of bailment, and only used the property as stipulated for, in the contract, and because his acts as bailee are the acts of the bailor. In cases of hiring, the bailee pays an equivalent to the bailor for the service. What difference can it make to the right owner, whether his slave worked for the tortious bailor, or innocent bailee ? If the bailee did not hire the slave, the bailor would keep him at work : how then has the bailee injured the right owner ?
The opinion delivered seems to regard the motives and intentions of the bailee as matters not to be considered^ In the case of Kennet vs. Robinson, (2 J. J. Mar. 87,) motives were directly considered, and much stress put upon them. There is a long quotation from Lord Ellenborough, made for no other purpose than to shew, that where the motive is charitable and kind, and there *134 was “ no intention to injure the property, or to convert it to the use of the taker,” it could not be deemed an “illegal conversion.” That case fully recognises the doctrine quoted from Starkie, and it decides that the use of the horse (“ Old Jolly,”) and lending and hiring him under the bailment, was not an illegal conversion. It is as proper, in my opinion, to consider the motives of a bailee, as to regard the motives of a kind nurse, who, under the directions of a murderous physician, administers arsenic, for calomel. The nurse is innocent: the physician is a murderer.
The opinion delivered concedes, that the doctrine for which I contend, is correct so far as it concerns innkeepers ; because as is said, “it was the innkeeper’s duty to receive the guest and the horse which he rode, and to-furnish shelter and food to both the man and the beast, if required to do so.” If the law did not enjoin this duty, then we must infer from the l’eason assigned, that' the innkeeper would be liable. Take the case ihen of a private hospitable country gentleman : Shall his hospitality be the cause of compelling him to pay for every horse, which tortious knaves may find means to introduce into his stables ? Is the owner of every stallion in the country, now extensively engaged in breeding and raising horses, responsible to the true owner for the value of eveiy mare bailed to him, and which the bailor may not own ? 1 deny that an innkeeper is under any ob ligation to receive and entertain a thief and the horse he rides, knowing hinr to be such. With such knowledge, it is the innkeeper’s duty to put the thief in jail, and secure the horse for the owner, by instituting proper legal proceedings. But conceding that it was his duty to receive and entertain those who are not known to, be guilty of crimes, and who yet introduce a stolen horse, which the innkeeper feeds, then according to the opinion delivered, if the innkeeper “detain the horse for his bill, and thus exercise dominion or proprietorship ” he is liable to the true owner 41 in trespass, trover or detinue, according to circumstances.” This is not the law, if Bacon can be trusted. He says (Title Inns and Innkeepers, D.) d If A injuriously take away the horse of B, and put him *135 Into an inn to be kept, and B come and demand him, he shall not have him until he hath satisfied the innkeeper for his meat.” Yel. 67. 3 Buls. 269, 270. 2 Rol. Ab. 85. Poph. 128, 179, and 2 Lord Raym. 867, are cited. I think the law as laid down in Bacon better comports with reason and good policy than the position assumed in the opinion delivered. ' It shews clearly that there may be at least one case, where the bailee coming into possesssion under a tortious bailor, may acquire rights which his bailor did not possess, and that he does not stand upon the same footing with the bailor in respect to the right owner.
Paley on Agency, 317, speaking of an attorney at law, says : “ Even if he sues for a debt which he knows to be released, and was himself witness to the release, yet it has been held that no action lies against him.” Here is a case where tire agent knowingly assists in the perpetration of a wrong, and yet, from considerations of public policy in regard to a useful profession, his acts are only considered as the acts of his client. I should be avers'e to sanction a principle which lets the designing, knowing perpetrator of a wrong' escape. But, surely* if a .lawyer may bide himself under-his client’s cloak, when he acted .with full knowledge, an innocent agent, after performing his trust in good faith, may say to the injured party, “it is my principal, and not me, that has wronged you.”
The opinion delivered puts this case: “A tells B to shoot a horse, asserting that ifrhis. B kills the horse, which turns out to be the .property of C. May not C recover from B, as a trespasser.?” The case-put is not. distinctly stated, in such manner as to enable me to say on which side the line it is, that I have kept in view in forming my opinion. If A was not in possession of the horse,T admit that JB would be. a trespasser on the rights of C. In that case, the law would apply which discountenances the idea of allowing a man to confer a right on liis agent, to do a thing which he could not do himself, 'and the agent at-his peril would meddle with property not possessed by his principal. But if the horse was in A’s possession, if he had converted the horse to his use, *136 anti then told B to shoot him, because the horse wa's crippled and would speedily die in all probability, and B did so to end his pain, I should decide that B was no trespasser. By the conversion, A’s possession is adverse j0 jps an¿ cannot complain of those who innocently, and from good motives, do no more than what the possessor directs. Suppose a farmer calls on his neighbor to assist him in killing his pork, and the neighbor butchers a hog found in the pen, not owned by the farmer, but which he has fraudulently converted before that time — who shall pay the right owner ? I think the farmer alone is bound.
The opinion puts the case of a sheriff who levies an execution, at the request of the plaintiff and defendant, on the property of a stranger in the defendant’s possession, and asks if the stranger may not recover from the sheriff in trespass or trover ? I answer, that the sheriff’s authority, in the execution of his official duty, is derived altogether from the law, and cannot be enlarged by attempts, on the part of individuals, to confer authority upon him. Under- the law, he levies executions at his peril, and the law gives him no authority to take the property of any one but the execution defendant. The taking is never in the character of bailee ; his possession of goods when taken is not subordinate ; is not the possession of another ; it is all his own ; and if he performs acts which are without legal sanction, as he is bound to act upon his own judgment, he will not be excused by setting up authority from individuals, in opposition to his powers derived from his official station. Were Í to concede the liability of the sheriff in the case stated, I could perceive no analogy in it to the case of Pool. But if it could be shewn that the sheriff had a right to throw of his official character, and to become the private agent in the transaction, of the plaintiff and defendant in the execution, to sell property which the defendant had con. verted to his use, but which rightfully belonged to another, and to pay over the proceeds of the sale to the plaintiff, and that he performed his trust in good faith, without knowledge of the stranger’s rights, I am of opinion that he would neither be responsible in trespass, *137 trover or any other action. The case would then be Eke that of Pool- '
The doctrine of the books, which in general subjects the servant, Or agent, to damages, as a tortfeasor^ when act-in'i; under the command of the master, or principal, applies to those cases only where the law puts the servant, or agent, on his guard, and enables him to ascertain, by inqnirv, whether he can act with safety in obeying the command. It never ought to apply, and I have seen no adjudged case where it was made to apply, to the conduct of a servant, or agent, who, bona fide, received the goods from the possession of the master, or principal, and disposed of them according to orders.
I shall hasten to the termination of a dissent already tedious, by noticing the decisions referred to in the opinion delivered.
The case of Rex vs. Almon, 5 Bur. 2687, throws no light on tile subject. It was a conviction for publishing a libel. The question was whether a sale of the pamphlet, in the defendant’s shop, by his servant, was prima fa-cie evidence of the defendant’s guilt. The court decided that it was. If the prosecution had been against the agent, or servant, perhaps the judges might have said something bearing on this case.
Bristol vs. Burt, 7 Johnson, 254, was an action of trover, brought to 'recover ninety five barrels of pot ashes, which Burt, as collector of the port of Oswego, under pretence of preventing a violation of the embargo act, undertook to control, by employing armed men to guard the property, and prevent the plaintiff and owner from removing it. The court correctly determined that the dominion thus assumed amounted to a tortious conversion. The defendant’s conduct invaded, and was alto, gether inconsistent with, the plaintiff’s right of property and possession, and he knew it.
Shotwell vs. Few, 7 Johnson, 302, was an attempt by Few, as inspector of a prison, to detain the goods of Shotwell, against light and knowledge, under pretence of a lien on them, to secure a debt due the institution. -
Murray vs. Burling, 10 Johnson, 172, was a breach of trust and a fraud practised by the defendant, in convert *138 ing the plaintiff’s property, to wit, a note of hand'deli v-* ered to the defendant, to enable him to raise money for the plaintiff’s use.
The case in 1 Wilson, 328, is this. On the 22d September, 1749, Hughes became a bankrupt. On the 23d of September, 1749, Smith, the defendant, the servant and riding clerk of Garroway, to whom the bankrupt was considerably indebted, went to the bankrupt’s shop to try to get his master’s money, and found it shut up. The bankrupt delivered to Smith the goods, who receipted for them In his master’s name, and sold the same for his master’s use. The assignees of the bankrupt sued Smith, in trover, for the goods, and recovered. It was objected, that they should not recover against Smith, because he was servant, and acted wholly for his master. Lee C. J. said: “ The point is, whether the defendant is not a tort-feasor', for if he is so, no authority that he can derive from his master, can excuse him from being liable in this action.” He then proceeds to shew, and I think correctly, that Smith was a tortfeasor. Smith took the goods from the bankrupt, knowing his bankruptcy, and it does not appear from the case as reported, that his master gave him any authority to receive the goods, or to sell them. He therefore, acted upon his own judgment and responsibility, and was the mover in the wrong. If his master had converted the goods, by receiving them from the bankrupt, and Smith had without knowledge of it, as the clerk and agent, sold them to his master’s customers, I think it would have presented a case- entirely different, and analogous to the present.
The post-revolutionary cases decided by Lord Ellen-borough, whose opinions are copied, are to this effect : Deane purchased goods from the bankrupts for Heath-cote, who was in America. Deane gave information to Elwall, the clerk, of Heathcote, of the purchase, on the day it was made. The goods were afterwards delivered to the defendant, Elwall, and he disposed of them by sending them to America, to Heathcote. Stephens &c. assignees of the bankrupts, recovered in trover against Elwall. His lordship speaks about the clerk acting under “an unavoidable ignorance, and for his master’s benefit,” *139 and still convicts Elwall of a tortious conversion» Bijt of what lie was unavoidably ignorant, which should cut any figure in the cause, I cannot learn from the facts reported. It does appear that Elwall was told of the purchase by Deane, on the day it was made, and it d'oes not appear that Deane delivered the goods to' Elwall. He may have received them from the bankrupts, and it is not probable that Deane failed to tell him from whom the goods had been purchased. Be these things, however, as they may, it is certain that the case is very unlike the present. Heathcote, the master, was in America ; never had possession of the goods, and gave no directions áboüt them. If a man sends an agent out in the world to purchase goods tor him, and gives no other instructions, the agent’s authority is limited to obtaining such goods as the vendor may lawfully sell, and if the agent receives any other kind, he does it at his peril. I see no resemblance,in the cases. The other case, to-wit, McCombie vs. Davies, in 6 Blast, 538, bears no-analogy to the present. There Coddan purchased tobacco for Mc-Combie, and afterwards pledged it to Davies, for an advance of money. Davies refused to surrender it to Mc-Combie, unless he would pay the money advanced; and set up a lien under the, assignment of Coddan. Eiien-borough C. J. convicted Davies of a conversion, very properly, upon the authority of the case of Baldwin vs. Cole, 6 Mod. 212.
' The words, that, “ he who assumes upon himself right of disposing of another’s gopds ” is guilty of a conversion, were first used by Holt G. J. in the case of B.aldioin vs. Cole. The facts of that case were these: “A carpenter sent his servant to work at the Queen’s yard for hire, and having been there some time,when he would go no more, the surveyor of the work would not let him have his tools, pretending a usage to detain tools to enforce workmen to continue till the Queen’s work was done.” Holt said, “ the very denial of goods to him that hath a right to demand them, is an actual conversion; for what is a conversion but an assuming upon onesself the property, and right of disposing, another’s goods.” I apprehend that the learned judge never contemplated applying his ex *140 pressions to the cáse of a bailee who had Honestly performed his engagement.
The facts of- the case of Parker vs. Godin, 2 Strange 813, are, “ Satur, a bankrupt, at the time of his going off, left some plate with his wife, who in order to raise money upon it, delivered it to her servant, who went along with the defendant to the door of Mr. Woodward, the banker, and there the defendant took the plate into his hands, and went into the shop and pawned it in his own name, gave his own note to repay the money, and immediately upon the receipt of it, went-back to the bankrupt’s wife and delivered the money to her.” To my mind there never was'a clearer case of tortious conversion than this. Godin, with full knowledge of all the facts, for he started from the house with the servant and went back to it, converted the plate to his own use. How he appropriated the money after he got it, was immaterial. He pawned the plate as his own.
The facts of the cases explain the general declarations of the judges and elementary writers. The present case, in my opinion, is unlike those which are referred to in point of fact, and therefore, I cannot admit the propriety of applying expressions used in reference to facts of a different nature, to the circumstances attending the bailment in the present case.
Ignorance of the law will excuse no one. This principle results from political necessity. But ignorance'of facts in many cases will furnish a complete shield to a defendant who would not be otherwise protected. Thus if a purchaser of land knows of a subsisting equity at the time of his purchase, he will be compelled to surrender his legal title; if he had no- such knowledge, and be a purchaser in good faith, he may retain the title. All the doctrines of notice, w'hich embrace a variety of heads, are based upon the idea that many of our most important-rights depend upon our knowledge, or our ignorance of facts.
Comyn on Contracts, 1 Vol. 243, shews that ignorance on the part of the vendee of the character of the factor, may make a difference in favor of the vendee. It is laid down in note (i,) Paley on Agency, 315, that “if the master *141 lock a man into his house, and deliver the key to his servant, if the servant be ignorant- that any body be there, he is not chargeable ; but if he knew that the master had imprisoned one tortiously, and he still kept him in prison, he is .liable to an action. This is a striking case to illustrate the difference between acting ignorantly, and knowingly. The same note cites Rol. Ab. 95, to shew that a servant who sells wine that is corrupted, knowing it to be so, is not liable, merely because he did it as a servant. A note in page 316, Paley on Agency, refers to the case of Mires vs. Solebay, 2 Mod. 242, where it is said to have been expressly decided, that trover would not lie against a servant for an unlawful intermeddling with the goods of another by command of his master, unless it amount to a trespass. I have not examined the facts of the case, but the principle established by it shews, in opposition to the doctrines of the opinion, that the servant and master stand on different ground. I have not had access to Roll’s Abridgement, and could not examine the references the opinion makes to it. An agent who receives money through mistake, and pays it over before knowledge, or notice, of the mistake, is not answerable. If he pays it over after notice, he is. 1 Comyn on Contracts, 250. So that I find no doctrine of the law better established than that which makes the knowledge or ignorance of facts, the essential point upon which important rights depend. My brethren have refused to inquire into the motives, or the extent of Pool’s knowledge. J think the inquiry would have been important, connected with the other facts, in his behalf.
The note (1) in 2 Saunders, 47, contains a reference to many cases, shewing what will amount to a conversion. The cases in 1 Wils. 328, 2 Stra. 813, and 6 Mod. 212, are there referred to, and the principles extracted from them by Williams, meet my approbation, and do ndt, conflict, I think, with the views I have taken of this case, indeed, I find in that note a strong confirmation of my opinion. It is there said : “Another ingredient of this action is, that there should be a conversion by the defendant ; as to which it is a common learning that where the goods come into the defendant’s possession by de *142 livery or finding, the plaintiff must demand them, and the defendant refuse to deliver them up, in order to constitute a conversion ; ” and he cites 1 Sid. 264, and Bull. N. I. 44. Buller says, if the goods come to the defendant’s hands, uby delivery, finding, or bailment, an actual demand and refusal.' ought to be proved.” And Williams says, in the aforesaid note, that a “demand and refusal is no evidence of a conversion ih the case of a carrier, or wharfinger, where the goods are proved to have been lost through negligence, or stolen, and therefore trover does not lie, though the owner may have an action upon the caseand he cites many authorities. Why is the refusal in such a case no evidence of conversion? I answer, because the carrier, or wharfinger, has it not in his power to deliver the goods, at the time of the demand. So here, Pool’s refusal to deliver the slaves after he had parted with them, according to the bailment, cannot amount to evidence of a conversion. And if, as the books say, Pool came to the possession by “ de~ livery or bailment,” as he unquestionably did, he was not guilty of a conversion before demand and refusal; and as refusal to deliver, when he could not, is no evidence of conversion, there has been a total failure to establish any thing like a tort against him.
The importance of the doctrine, which the opinion delivered tends to settle, has induced me to suggest many fictitious cases for the purpose of testing its operation. I have endeavored to avoid misconception, or misapplication of its principles to the supposed cases. If, however, I have erred, I have the consolation, that the opinion contains an “ exclusion of a conclusion,” in reference to the cases which may hereafter come up, and it will be then proper in the present'members of the bench, or our successors, to review this case, in deciding how far it shall be the rule to govern others.
Believing that Pool is not responsible in any form of action, I have not considered the question as to the propriety of the remedy.
I think the instruction which the court refused to give was applicable to the facts proved, and ought to have been given.